UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**TIMOTHY STEPHENS**                                                            **PLAINTIFF**
**ADC #145440**

V.                              NO. 4:19-cv-00113-JM-JTR

**MIKE SYLVESTER,** *et. al.*                                                   **DEFENDANTS**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge James Moody. Any party may file written objections to this Recommendation. Objections must be specific and include the factual or legal basis for disagreeing with the Recommendation. An objection to a factual finding must specifically identify the finding of fact believed to be wrong and describe the evidence that supports that belief.

An original and one copy of the objections must be received in the office of the United States District Clerk within fourteen (14) days of this Recommendation. If no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may also waive any right to appeal questions of fact.

## I. Introduction

Plaintiff Timothy Stephens ("Stephens"), filed his *pro se* § 1983 action contending that on September 20, 2018, while detained in the Pulaski County Regional Detention Facility ("PCRDF"), his constitutional rights were violated.[1] More specifically, Stephens contends that: (1) Defendant Sergeant Zachary Thompson, Sergeant Janeka Watkins, and Lieutenant Jason Bangs failed to timely and adequately respond to a gas leak, placing his life in danger and prolonging his exposure to harmful gas fumes; and (2) Defendants Jail Administrator Mike Sylvester and Jail Administrator Charles Hendricks failed to provide safe inmate housing in the PCRDF by refusing to install carbon monoxide detectors. *Doc. 7 at 5-16*. Defendants are sued both in their official and individual capacities. Stephens seeks injunctive relief, compensatory damages, and punitive damages. *Doc. 7 at 3, 15-16*.

Defendants have filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts.[2] *Docs. 61, 62, 63*. Stephens has filed a

---

[1] The Arkansas Division of Correction website indicates that Stephens was sentenced on April 9, 2019 on various state charges. Thus, Stephens was a pretrial detainee at the time the alleged constitutional violation occurred.

[2] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party

2

Response opposing their request, but did not include a Brief in Support or Statement of Disputed Facts. *Doc. 65*.[3]

Before reaching the merits of Defendants' Motion for Summary Judgment, the Court will review the relevant undisputed facts giving rise to Stephens's claims.[4]

    1.    On April 18, 2018, Stephens was arrested and booked in the Pulaski County Sheriff's Office for Domestic Battery 3rd. *Doc. 63-2 at 1*.

    2.    On September 20, 2018, at approximately 7:00 a.m., the PCRDF Maintenance Department received a telephone call regarding a suspected natural gas leak. In response, a plumber, Jack Dye ("Dye') was asked to investigate the smell. Shortly after 7:00 a.m., the natural gas was turned off. Affidavit of Russ Burks, Supervisor of the PCRDF Maintenance Department, *Doc. 63-7*.

    3.    Dye found a natural gas leak on the PCRDF's roof, not within any unit. By 9:00 a.m., Dye had repaired the natural gas leak. *Id*.

    4.    The PCRDF does not have carbon monoxide detectors. *Id*. However, a carbon dioxide detector registers carbon dioxide, not natural gas. *Id*.

---

must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[3]The Court previously denied Defendants' Motion for Summary Judgment based on exhaustion. *Doc. 40 & 59.*

[4]Plaintiff's Response does not contest any undisputed material fact set out by Defendants in a separate statement of fact or otherwise. Accordingly, Defendants' material facts not in dispute, *Doc. No. 63*, are deemed admitted. Local Rule 56.1(c); FED. R. CIV. P. 56(e)(2).

5. Stephens did not submit any sick call requests complaining of any symptoms or illnesses relating to an alleged gas leak that occurred on September 20, 2018. *Doc. 63-4.*

6. It is possible that a small amount of the natural gas could have been brought into the unit through the outside "dampers," which allow a small amount of outside air into PCRDF for fresh air. *Doc. 63-7.*

7. The blower of the HVAC unit was disabled for a couple of hours while the repairs were made to lessen the smell of natural gas being brought into the unit. *Id.*

8. Mr. Dye repaired the natural gas leak by approximately 9:00 a.m. *Id.*

9. On December 16, 2019, Defendants' counsel deposed Stephens. *Doc. 63-6.* He testified that he noticed an odd odor between 5:00 and 6:00 in the morning when he woke up for breakfast, but thought it was the food. *Doc. 63-6 at 24.*

10. He testified that after breakfast he returned to his cell, and noticed the smell getting stronger and heard other inmates speaking loudly. *Id.*

11. Stephens testified that he knew the odor was coming from the ventilation inside the cell. *Id. at 24-25.*

12. Stephens testified that he then began to get dizzy and lightheaded, but it wasn't really notable. *Id. at 25.*

4

13. Stephens testified: "I'm going to say between 6:30 and 7:30 would be probably a good estimate of the time when, that the smell was getting stronger, because when I woke up for breakfast, I noticed a smell but couldn't even identify it. As I said earlier, I even thought it might have been the food. But when I got back in the cell after eating, which was probably, you know, 30 minutes or so after I woke up, it was stronger then, and it seemed to be getting stronger. And my symptoms were definitely getting stronger..." *Id. at 42-43.*

14. Stephens said that he and other inmates began beating on the door, and then Sgt. Watkins and Sgt. Thompson came into the unit to see what the issue was. *Id. at 25.*

15. Stephens did not see or speak to either sergeant, but they left, and shift change was at 7:00 a.m. *Id. at 25-26.*

16. Stephens estimated that this occurred between 5:30 and 7:00 a.m. since it was prior to shift change. *Id. at 26.*

17. After shift change at 7:00 a.m., Sgt. Mesonic let the inmates out of their cells to evacuate to the outside activity area. *Id. at 26.*

18. Stephens testified that maintenance was called in, and after a period of time it was deemed safe. *Id. at 26.*

19. The inmates were evacuated between 7:30 and 8:00 a.m., and then were taken back inside to their cells by 9:00 a.m. after they were given the all clear. *Id. at 33 and 42*.

20. The gas smell was noticeable to Stephens for approximately two to three total hours. *Id. at 44*.

21. Stephens testified that his physical symptoms included: "just physically, the coughing, the, you know, I had, I was dizzy. I felt nauseous. Just, I had a headache, a very sharp headache. There might be a couple of others, but I mean that's the gist of it, as far as physical symptoms." *Id. at 31*.

22. According to Stephens, the smell was gone by the time he was back inside around 9:00 a.m. *Id. at 33*. Following his return to his cell, Stephens testified that he no longer experienced any physical symptoms. *Id. at 33-34*.

23. Stephens testified that his physical symptoms: "only lasted for a couple of hours. As a matter of fact, I noticed those diminishing once I got outside. So I might even be, even to say a couple of hours might be overstating it still because I think by 8:00 is roughly the time that, it might have been a little before that, that we were taken out of our cells and put in the outside area. So maybe right at a couple of hours or so, give or take." *Id. at 32*.

24. On April 19, 2019, Stephens was released from the PCRDF. *Doc. 63-2 at. 1*.

## II.     Discussion

### A.     Official Capacity Claims

As a matter of law, the "official capacity" claims that Stephens has asserted against Defendants must be construed as claims against their employer, PCRDF. *Brewington v. Keener,* 902 F.3d 796, 800 (8th Cir. 2018). PCRDF cannot be held vicariously liable, in a § 1983 action, for the acts of its employees. *Id.* at 800-01 (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95 (1978)). Instead, it can only be held liable if its policies, customs, and practices caused Stephens' injury. *Brewington,* 902 F.3d at 801-02; *Corwin v. City of Independence, Missouri,* 829 F.3d 695, 699-700 (8th Cir. 2016).

Because Stephens does not allege that a PCRDF policy, practice, or custom caused his injury, he has failed to plead plausible official-capacity claims against Defendants. Accordingly, those claims should be dismissed.

### B.     Individual Capacity Claims

Defendants maintain they are entitled to qualified immunity.[5] *Doc. 61 at 7; Doc. 62 at 12-13.* To "overcome the defense of qualified immunity," Stephens must

---

[5] Qualified immunity protects government officials who acted in an objectively reasonable manner and shields an official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. *McClendon v. Story Cty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). Therefore, issues concerning qualified immunity are appropriately resolved on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (the privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a

show that: (1) the facts, viewed in the light most favorable to him, demonstrate the deprivation of a constitutional right; and (2) the constitutional right was clearly established at the time of the deprivation. *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016); *Livers v. Schneck*, 700 F.3d 340, 350 (8th Cir. 2012).

The Due Process Clause of the Fifth and Fourteenth Amendments protects pretrial detainees like Stephens from conditions that "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in a constitutional sense." *Id.* at 537. "There is, of course, a de minimis level of imposition with which the Constitution is not concerned." *Id.* at 539, n. 21 (*quoting Ingraham v. Wright*, 430 U.S. at 674).

Under the *Bell* standard, Stephens has two ways to demonstrate the conditions in the PCRDF rose to the level of punishment during to the gas leak. Stephens could show that the conditions were intentionally punitive. *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (citing *Bell*, 441 U.S. at 538). Or, absent "expressly demonstrated intent to punish," Stephens could show that the conditions in the PCRDF during the gas leak were "not reasonably related to a legitimate

---

case is erroneously permitted to go to trial"). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Pearson*, 555 U.S. at 236). Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. *Id.*

8

governmental purpose or were excessive in relation to that purpose." *Id.* (citing *Bell*, 441 U.S. at 538-39). Conditions that are arbitrary or excessive create a permissible inference that the purpose of governmental action is punishment. *Id.* at 909-10 (citing *Bell*, 441 U.S. at 539).

Stephens does not allege, and the record does not evidence, any demonstrated intent to punish him by exposing him to the gas leak. Accordingly, he must show Defendants "caused conditions that were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose." *Id.* at 907 (citing *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010)). Stephens has not made the required showing.

Stephens has failed to show that Defendants objectively caused the gas leak or unreasonably exposed Stephens to gas. He has not shown any arbitrary or excessive conduct by Defendants.

Stephens testified that he first noticed the odor when he woke up, but thought it could "just be the food." *Doc. 63-6 at 24.* After he returned from breakfast, the odor had become stronger. *Id.* Stephens and other inmates began banging on the cell doors and shouting to get attention. *Id. at 25.* Defendants Thompson and Watkins entered the unit to investigate the disturbance. *Id.*

Defendants Thompson, Watkins, and Bangs addressed the gas exposure soon after they became aware of it. Inmates were evacuated outside sometime between

9

7:30 a.m. and 8:00 a.m. and then were taken back inside to their cells, around 9:00 a.m., after the gas leak on the roof was repaired. *Doc. 63-6 at 33 and 42*. According to Stephens, the smell was gone by that time. *Id. at 33*. Thereafter, Stephens experienced no more physical symptoms. *Id. at 33-34*.

Objectively, there is no basis for finding any Defendants were aware of any potential medical problems, only complaints of an unidentified odor. Defendant Bangs only learned of the leak when Sergeant Mesonic informed him of the possible gas smell in the cell block. *Id. at 28*. Stephens has not established that either Defendants Sylvester or Hendrick learned about the odor in the cell block or any related health concerns.

Defendants took reasonable actions to investigate the source of the odor, repair the gas leak, and address the potential impact on the inmates' health. Stephens even admits that Defendants Thompson, Watkins, and Bangs "did something" to remedy the problem. When the inmates were evacuated outside, Stephens's alleged symptoms diminished. *Doc. 63-6 at 32*.

When considering if a condition amounts to punishment, a court must look at the totality of circumstances of confinement, not any particular condition in isolation. *Stearns*, 957 F.3d at 908-909. *Nothing* about this temporary gas leak comes close to suggesting Stephens suffered punitive confinement.

Stephens also complains that Defendants Sylvester and Hendricks created an excessive risk because they failed to install carbon monoxide detectors in the cell block. Stephens offers no proof that: (1) as Jail Administrators, either Sylvester or Hendricks was authorized to place carbon monoxide detectors in the cell block; or (2) the presence of carbon monoxide detectors would have offered any protection from the gas leak. Carbon monoxide sensors detect carbon monoxide, *not natural gas*. Stephens does not have a constitutional right to claim that the PCRDF must install the detection devices *he believes* are necessary to protect prisoners.

At most, some of the Defendants actions *might* support a claim for negligence. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Stearns*, 957 F.3d at 908, n. 5 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S. Ct. 1708 (1998). PCRDF officials are not liable for mere negligence under the *Bell* standard. *Stearns*, 957 F.3d at 908, n. 5. Even gross negligence would not rise to a constitutional violation. *See Eason v. Thaler*, 73 F.3d 1322, 1328-29 (5th Cir. 1996) (deliberate indifference not supported by claim based on prison official's alleged gross negligence in permitting natural gas exposure insufficient to support a constitutional violation).

Because the Court concludes that Defendants did not violate Stephens' constitutional rights, it is not necessary to address the "clearly established" prong of the qualified immunity test. *See Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011)

11

(reaffirming "that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first"); *Kulkay v. Roy*, 847 F.3d 637, 645-46 (8th Cir. 2017) (holding that, where a plaintiff fails to establish a constitutional violation at the first prong of the qualified immunity analysis, the court "need not proceed to the second prong to determine whether the alleged constitutional violation was also clearly established at the time in question").

### III.  Conclusion

Accordingly, because qualified immunity protects all Defendants from liability on any of Stephens' claims, all of those claims should be dismissed, with prejudice. IT IS THEREFORE RECOMMENDED THAT Defendants' Motion for Summary Judgment, *Doc.61*, be GRANTED, and Plaintiff's claims against them be DISMISSED, WITH PREJUDICE.

Dated this 9th day of July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE